IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 26, 2006 Session

## HARVEY PHILLIP HESTER v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamilton County
No. 238877   Douglas A. Meyer, Judge**

_____

**No. E2005-01607-CCA-MR3-PC - Filed February 13, 2007**

_____

The State appeals the Hamilton County Criminal Court's granting the petitioner's request for post-conviction relief from his convictions for two counts of second degree murder and one count of attempted second degree murder and effective sixty-two-year sentence.  In this appeal, the State claims that the trial court erred by concluding (1) that the petitioner received the ineffective assistance of trial counsel and (2) that the petitioner did not voluntarily and knowingly waive his right to a twelve-member jury verdict.  Upon review of the record and the parties' briefs, we conclude that the trial court erred by granting the petitioner's request for post-conviction relief and reverse the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and J.C. MCLIN, JJ., joined.

Gary L. Anderson, Knoxville, Tennessee, for the appellee, Harvey Phillip Hester.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William H. Cox, III, District Attorney General; and Rodney C. Strong, Assistant District Attorney General, for the appellant, State of Tennessee.

**OPINION**

**I.  Factual Background**

The petitioner was charged with two counts of first degree premeditated murder and one count of attempted first degree premeditated murder, and a trial was held in September 1995.[1]  The

---

[1] Judge Stephen M. Bevil presided over the petitioner's trial but unable to conduct the post-conviction hearing due to illness.

jury convicted the petitioner of two counts of second degree murder and one count of attempted second degree murder, and the petitioner received an effective sentence of sixty-two years in confinement. On direct appeal, this court summarized the facts underlying the petitioner's convictions as follows:

> On August 8, 1994, Richard Serna (Richard), his daughter, Angela, and his brother, Paul Serna (Paul), drove to the "blue hole" on Suck Creek Road at Signal Mountain to swim. Upon their arrival, the defendant was in the parking lot. Richard Serna briefly engaged in friendly conversation with the defendant after which the Sernas walked to the swimming area. Sometime later, the defendant approached them and asked if they had seen his wallet. The defendant searched unsuccessfully for his wallet and then left. Angela described this exchange as "pleasant."
>
> About five minutes later, the defendant returned and again inquired about his wallet. He pointed out that the Sernas were the only others in the area and explained that his wallet contained around $2,200. The defendant left but soon returned and insisted his wallet had to "be here somewhere." When he mentioned that he had a gun in his car, the Sernas were surprised. Paul placed a knife in his pocket but made no threats to the defendant.
>
> After the defendant left, the Sernas gathered their belongings and returned to their car. When they reached the parking lot, the defendant asked permission to search. While the Sernas allowed a search, the defendant did not find his wallet. The Sernas then drove away. After driving [only] a short distance, the Sernas noted the defendant was following them. He rammed the back of their car several times and, at one point, the Sernas' car "fishtailed" around a bigger truck.
>
> At trial, Angela testified that the defendant struck their vehicle in the rear "over and over again . . . continuously the whole way down the mountain." She estimated that their vehicle was struck more than twenty times. As their car passed by the Suck Creek Boat Ramp, Angela yelled out the window asking for someone to call the police.
>
> She recalled that at the bottom of the mountain, Suck Creek Road terminates at its intersection with Signal Mountain Boulevard, a four-lane road. She remembered that the defendant rammed their car into the four-lane road. At another intersection, only a short distance away, Richard and Paul Serna stopped their vehicle and

confronted the defendant. Paul drew his knife from his pocket but held it to his side. Angela testified that an argument ensued about the wallet but that her next memory was waking up in the hospital. Initially unable to recognize her mother, Angela Serna had suffered a broken pelvic bone and a broken leg. All of her facial bones were broken. She required bone graft surgery on her nose.

James Pilkington, who observed the confrontation at the intersection of Mountain Creek Road and Signal Mountain Boulevard, testified that the Sernas appeared to be frightened. When Pilkington stopped at a nearby Conoco to call the police, he noticed the Sernas' vehicle drive by and thought the altercation might have ended. When he drove around a curve, however, he saw that the Sernas had been involved in a wreck.

Mark Payne, who also saw the confrontation between the Sernas and the defendant at the intersection of Signal Mountain Boulevard and Mountain Creek Road, testified that either Richard or Paul was standing on the side of the road with a terrified look on his face. He saw that individual run and then observed the driver of the Serna vehicle stop to allow him to enter. The defendant's vehicle "shot right through the light and started chasing [the Sernas'] Nissan." Payne described the defendant as "chasing [the victims] down." Michael Eugene Hood, who also witnessed the confrontation at the intersection, corroborated Payne's version of the events.

James DeSha, who was traveling on Signal Mountain Boulevard on the day of the wreck, testified that he saw a white Cutlass ram a red Nissan Pulsar on two occasions. He also saw the Cutlass move to the outside lane to the right side of the Nissan and "turned in on him," ramming into the back bumper of the Nissan, spinning it sideways. He recalled that the Sernas' Nissan slid sideways, became airborne, flew across a red Thunderbird, and onto the hood of a green Dodge. DeSha claimed that the defendant, who was driving the Cutlass, grinned as he drove away at a high rate of speed. DeSha was able to get the license plate number of the Cutlass.

Officer Charles Russell of the Chattanooga Police Department investigated the accident. He found three cars with "a considerable amount of damage." The victims' car contained several beer cans. At approximately 1:00 A.M. the day after the wreck, he located the Cutlass driven by the defendant. The license tags had been removed. While there were no dents to the front of the defendant's car, the front

right fender did have a presence of red paint, the color of the Serna vehicle. The defendant, who had suffered a black eye, voluntarily turned himself in to police.

Dr. Charles Harlan performed an autopsy on Paul Serna. Death resulted from a ring fracture of C-1 and C-2 cervical vertebrae, which is the area where the skull fits on to the vertebral column. His blood alcohol content was .03 percent, which indicated he had consumed less than two units of alcohol.

Richard Serna, who had a blood alcohol content of .032 percent, was a quadriplegic due to the brain injuries suffered in the accident. He died on January 20, 1995, several months after the car wreck. According to Dr. Frank King, the Hamilton County Medical Examiner, the cause of death was "acute bronchial pneumonia due to chronic medical debilitation due to head injury."

Attorney Joe McBrien, who represented the defendant in a civil case, appeared as a defense witness. He testified that the defendant had received a settlement award of $3518.75 six days before this incident. He recalled that the defendant received cash in that amount.

John Hackney, who lived at the foot of Suck Creek Mountain, was traveling to his residence on the day of the wreck, when he passed a car and then saw a billfold "blow up in the air." He stopped his vehicle and found the billfold and large denominations of cash lying on the ground. He testified that he picked everything up and left. The identification in the billfold was that of the defendant. Hackney admitted that he kept the money. He burned the wallet. He conceded that he had bragged to his co-workers about finding the cash, which is how the defense attorneys eventually located him. He acknowledged that he never notified the police about finding the wallet.

. . . .

David Blackburn testified that he was with the defendant at the time of the wreck. An individual named John and a girl whose name he could not recall were also present. Blackburn recalled that the defendant had a large amount of money in his possession before they went to the swimming hole. Blackburn testified that he separated from the defendant and then saw him in the parking lot.

-4-

His eye was swelling shut and his nose or mouth was "busted." The defendant claimed that the people pulling away in another car had just robbed him.

Blackburn testified that the defendant followed the Sernas down the mountain and bumped their car several times. When they reached Signal Mountain Boulevard, the defendant and John got out of their vehicle. He saw one of the Sernas approach waving a knife; when the Sernas returned to their vehicle, the defendant continued to follow them. Blackburn testified that he suggested that the defendant continue to follow so they could eventually call the police. Blackburn claimed that the driver of the Nissan kept swerving in and out in an attempt to keep the defendant from driving alongside. He testified that after the accident, the defendant drove him to his car. Blackburn was charged with "accessory after the fact" but the charges were dismissed. He acknowledged prior convictions for theft, robbery, and drug-related offenses.

State v. Harvey Phillip Hester, No. 03C01-9704-CR-00144, 1998 Tenn. Crim. App. LEXIS 600, at **2-9 (Knoxville, June 4, 1998). This court reversed the petitioner's second degree murder convictions because the trial court had refused to instruct the jury on vehicular homicide as a lesser included offense of first degree murder. Id. at **11-22. However, our supreme court remanded the case for reconsideration in light of State v. Dominy, 6 S.W.3d 472 (Tenn. 1999), and this court subsequently affirmed the petitioner's convictions. State v. Harvey Phillip Hester, No. 03C01-9704-CR-00144, 2000 Tenn. Crim. App. LEXIS 275 (Knoxville, Mar. 22, 2000), perm. to appeal denied, (Tenn. 2000).

The petitioner timely filed a petition for post-conviction relief, claiming ineffective assistance of counsel and prosecutorial misconduct at trial. In an amended petition, the petitioner claimed that he received the ineffective assistance of counsel because his trial attorneys unilaterally decided during his trial to abandon a vehicular homicide defense and argue to the jury that the petitioner was innocent of all charges "even though counsel knew from discovery prior to trial, and from the evidence presented at the trial, that the State's evidence at a minimum established negligent and/or reckless conduct." He also claimed that he received the ineffective assistance of counsel because his attorneys coerced him into waiving his right to a twelve-member jury.

The petitioner's lead counsel at trial and on direct appeal testified that the petitioner's mother hired him to represent the petitioner and "worked herself to death to pay [for] it." The petitioner had been charged with two counts of first degree murder and one count of attempted first degree murder, and "we thought a lesser offense, like vehicular homicide, . . . would be a good verdict; however, we tried for no conviction." At some point during the trial, the trial court informed the defense that it was going to instruct the jury on criminally negligent homicide and reckless homicide but was not going to instruct the jury on vehicular homicide. Counsel said that upon learning the trial court was

not going to give a vehicular homicide instruction, "we did argue about negligence, and that it was not an intentional thing." Counsel stated that the defense also "didn't think it was reckless."

Lead counsel testified that at the end of the trial, a juror got sick and had to be dismissed from the jury. Counsel had previously been in a similar situation in federal court and had learned that a federal jury could be comprised of less than twelve members. Based on what he learned during that federal case, counsel did not believe the petitioner had a constitutional right to a twelve-member jury in this case. Nevertheless, he conferred with the petitioner and told the petitioner about the option of a mistrial. He also told the petitioner that if the petitioner accepted a mistrial and was retried, "I just don't think your mother can afford us." He testified that he believed that statement played a significant role in the petitioner's decision to waive his right to a twelve-member jury, that the petitioner was not an educated man, that he did not believe the petitioner made the decision to waive his right to a mistrial, and that "we probably made [the decision] for him."

Lead counsel testified that the trial court also was unaware of the petitioner's constitutional right to a twelve-member jury and that no one told the petitioner he had such a right. However, he acknowledged that the trial court told the defense it had prepared a written waiver of the right to a twelve-member jury "to be on the safe side" and that the trial court had the petitioner read and sign the waiver. Counsel stated that if he had known the right to a twelve-member jury was a constitutional right, "I wouldn't have let it be my decision rather than his." He stated that Angela Serna had been a sympathetic witness for the State and had "hurt the defense to the nth degree" and that based on her testimony, the defense should have accepted a mistrial. He acknowledged that James DeSha was also an effective witness for the State but said the defense was able to cross-examine him "pretty good." He stated that if the defense had accepted a mistrial, it could have plea bargained with the State and could have filed a motion for a change of venue due to excessive publicity. He stated that when he advised the petitioner not to accept a mistrial, he did not advise the petitioner about any of these serious problems with the petitioner's case. He said that he did not believe he acted effectively when he advised the petitioner to turn down the trial court's offer for a mistrial.

On cross-examination, lead counsel testified that he and co-counsel gave the petitioner the best defense they could and acknowledged that the jury acquitted the petitioner of the most serious charges. He stated that he believed he argued during closing arguments that the petitioner had acted negligently rather than recklessly. Regarding the decision to waive a twelve-member jury, lead counsel stated that it was "a hectic decision and a quick decision we had to make." He acknowledged that the trial court questioned the petitioner about the waiver on the record, that the trial court informed the petitioner that it could declare a mistrial, and that the trial court had the petitioner sign a waiver form. However, he stated that if he and the trial court had known the right to a twelve-member jury was a constitutional right, he would not have persuaded the petitioner to waive that right and the trial court "would have handled it differently, too."

Co-counsel testified that he and lead counsel talked with the petitioner about the twelve-member jury issue but that he did not remember the details of the conversation. He said, "I think we

discussed some of the witnesses . . . that had testified. I think we discussed Angela Serna and how effective she was." He also stated that "there was give and take about the witnesses and what would, you know, be involved in a retrial." Co-counsel stated that he did not believe DeSha had been as an effective witness for the State "as it looks in the record" and that the defense did not hire an accident reconstruction expert because there were no large dents in the bumper of the petitioner's car to indicate the petitioner had rammed the victims' car. The defense also did not hire an expert because counsel did not believe the petitioner's mother could afford it and because the defense had photographs which did not support the State's theory. However, he stated that if the trial court had declared a mistrial, the defense possibly would have hired an accident reconstructionist for the petitioner's retrial. On cross-examination, co-counsel testified that if the petitioner had wanted a mistrial, the defense would have let him have one and that he believed he and lead counsel made it clear to the petitioner that he could receive a mistrial.

The petitioner testified that when he first met with lead counsel, counsel told him,"I can't save you from going to prison, . . . but I can cut the time down" and that he would probably serve a two- to six-year sentence for vehicular homicide. After the trial court refused to charge vehicular homicide to the jury, the petitioner's attorneys told him they were going for a not-guilty verdict, and he acknowledged that his attorneys switched from a vehicular homicide defense to a not-guilty defense. He stated that the defense "spent all trial arguing [he] was guilty of something, and then at the last minute we go in and close with a not guilty verdict." He stated that switching to a not-guilty strategy was "insane" and that if he had known then what he knows now, he would have argued that he was guilty of a lesser included offense. He stated that his attorneys never talked about reckless homicide as an alternative defense and that lead counsel controlled the defense's decision-making throughout the trial.

The petitioner testified that after a sick juror was excused from the panel, his attorneys met with him in a holding cell. They explained to him that he could have a mistrial, but he did not know what that meant and told lead counsel, "I ain't never been to a jury trial" and "I don't know what's going on. I'm putting my life in your hands." Lead counsel told the petitioner that he knew how to read a jury and that "I think we got a good shot at taking this 11-man jury." The petitioner asked co-counsel what he thought, and co-counsel told him, "Yeah, I think we got a good chance at it, too." Lead counsel told the petitioner that the petitioner's mother would not be able to afford his services again, and neither attorney told the petitioner that he had a constitutional right to a twelve-member jury or a right to appointed counsel for a retrial. The petitioner stated that if he had accepted the trial court's mistrial offer, he believed his family and friends could have raised enough money to hire an accident reconstructionist for his retrial.

On cross-examination, the petitioner testified that after lead counsel told him he had a "good shot" with an eleven-member jury, he "chose to let my life ride in [lead counsel's] hand." He made the decision to waive the twelve-member jury but trusted his lawyer and was coerced into the waiver. He stated that his attorneys should have argued that he was guilty of reckless homicide but acknowledged that counsel argued negligence. He acknowledged that the trial court told him he had a right to a mistrial and that if he had accepted a mistrial, he would have been retried for first degree

murder. He had wanted to testify at trial, but his attorneys told him he could not testify because he had two prior theft convictions. He stated that if he had testified, he would have admitted that he hit the victims' car a few times as they were driving down Signal Mountain. However, he would have testified that he did not cause the victims to wreck their car.

Bruce Poston, a Knoxville criminal defense attorney, testified as an expert for the petitioner. He stated that he became licensed to practice law in 1999 and that since February 2001, he had represented defendants in eight first degree murder trials and had settled eleven other murder cases. He listened to the petitioner's attorneys testify during the post-conviction hearing and read the entire trial record for this case. Based on all of that information, he concluded that the petitioner's trial attorneys rendered deficient performance and that the petitioner was prejudiced by the deficiency because "it's clear" there could have been a different outcome. He stated that Angela Serna "came across very well" but appeared to be "hiding a lot of stuff" during her testimony and that the defense could have challenged her credibility. He also noted that the defense rested its case with its key witness, David Blackburn, admitting to having a prior robbery conviction. In light of all of the problems with the petitioner's case, Poston stated that the defense should have taken a mistrial and could have hired an accident reconstructionist for a retrial. He surmised that an accident reconstructionist could have challenged DeSha's testimony and shown that the petitioner's car did not hit the victims' car with enough force to cause the wreck. He stated that DeSha's testimony about the petitioner grinning was damaging and that a reconstructionist also could have challenged the amount of time DeSha was able to see into the petitioner's car.

Poston testified that an attorney has to know that a defendant has a constitutional right to a twelve-member jury and that there was "no excuse" for turning down the trial court's offer for a mistrial. He stated that if the trial court had declared a mistrial, the defense would have had "a perfect opportunity to go back, correct the errors that were made by the defense and do it better." He stated that the defense had been counting on a vehicular homicide jury instruction and that the defense should have accepted a mistrial. He said that, at the very least, the defense should have argued the petitioner was guilty only of reckless homicide because the jury was not going to acquit the petitioner "with two dead bodies and a maimed victim." He said defendants are scared and do what their lawyers tell them. He stated that if the petitioner had been retried, the State would have had a difficult time proving second degree murder.

On cross-examination, Poston testified that of his eight recent jury trials, one defendant was acquitted and three were convicted of first degree murder. He stated that lead counsel in the instant case rendered ineffective assistance of counsel because he tried to convince the jury to acquit the petitioner rather than argue the petitioner was guilty of a lesser included offense. Poston acknowledged that he was not present at the petitioner's trial and did not observe the witnesses. He said that the facts of this case showed the petitioner acted recklessly and that it would have been a "good idea" for an accident reconstructionist to have testified at the post-conviction hearing. He concluded that the petitioner declined the trial court's offer to grant a mistrial because that is what his trial attorneys told him to do.

In a written order, the post-conviction court concluded (1) that the petitioner received the ineffective assistance of counsel because his trial attorneys failed to argue to the jury that the petitioner was guilty of criminally negligent homicide or reckless homicide and (2) that the petitioner did not voluntarily waive his right to a twelve-member jury. The court granted the petitioner's request for post-conviction relief.

## II. Analysis

### A. Failure to Argue Lesser Included Offenses

The State contends that the defense's opening and closing statements reveal that it never changed its theory of defense but consistently maintained throughout trial that the petitioner was not guilty of any crime. The State also contends that even if the defense abandoned its original theory of defense and rendered deficient performance, the petitioner has failed to show prejudice because if the jury had "desired to return a guilty verdict for reckless homicide or criminally negligent homicide, it could have done so." Finally, the State argues that the defense was under no obligation to argue the petitioner was guilty of lesser included offenses because the petitioner wholeheartedly believed, and maintained at the post-conviction hearing, that he did not commit a crime. The petitioner claims that the post-conviction court properly concluded that he received the ineffective assistance of counsel. He maintains that lead counsel admitted changing the petitioner's theory of defense during the trial and that the defense's final argument indicates it abandoned the petitioner's original vehicular homicide defense. We hold that the trial court erred by concluding the petitioner received the ineffective assistance of counsel.

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.2 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we afford the post-conviction court's findings of fact the weight of a jury verdict, with such findings being conclusive on appeal absent a showing that the evidence in the record preponderates against those findings. Id. at 578.

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). However, we will review the post-conviction court's conclusions of law purely de novo. Id. "To establish ineffective assistance of counsel, the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466

U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)).  In evaluating whether the petitioner has met this burden, this court must determine whether counsel's performance was within the range of competence required of attorneys in criminal cases.  See Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim."  Goad, 938 S.W.2d at 370.

In finding that the petitioner received the ineffective assistance of counsel, the post-conviction court reviewed defense counsel's opening and closing statements from the trial transcript and concluded that "no inconsistency [in the petitioner's theory of defense] was apparent to the jury." However, the court also concluded that after the trial court refused to instruct the jury on vehicular homicide, "[c]ounsel could still have argued reckless homicide and criminally negligent homicide." The trial court agreed with Bruce Poston's testimony that the jury probably would not have acquitted the petitioner of all the charges and held that "counsel should not have completely abandoned the intent theory and should have acknowledged the petitioner's apparent errors in judgment as recklessness or negligence."  Regarding prejudice, the post-conviction court stated as follows:

> As Mr. Poston observed, during the trial, the credibility of the defense was diminished by [defense counsel's] cross-examination regarding the victims' consumption of alcohol and subsequent unsuccessful attempt to exclude evidence of the victim driver's negligible blood alcohol levels and by the impeachment of Mr. Blackburn, who was the only one of the petitioner's three passengers to testify.  Clearly, had the defense acknowledged the petitioner's apparent errors in judgment, it would have been more credible. Considering, despite the presence of three passengers in the petitioner's vehicle, the lack of direct evidence of intent and the ambiguity of the circumstantial evidence of the same, the Court cannot dismiss as inconsequential the impact of defense credibility on verdicts[.]  It therefore concludes that counsels' performance in this respect was also prejudicial.

We too have reviewed the trial transcript.  During the defense's opening statement, lead counsel never mentioned "vehicular homicide" but said, in pertinent part,

> Now, our contention is that he was trying to stop them and that that was a reasonable pursuit, and he should have stopped them. And look at what his state of mind was.  It was passion, it was -- he was angry, no question about that.
>
> . . . .
>
> At the conclusion, we will -- we respectfully submit to you that you will find that there is a reasonable doubt with regard to these

-10-

charges against this man.

During the trial, defense counsel learned that the trial court would not be giving the requested vehicular homicide instruction.[2] In the defense's closing arguments, counsel specifically addressed the elements of second degree murder, voluntary manslaughter, and criminally negligent homicide and argued to the jury that the petitioner was not guilty of those crimes. Although lead counsel did not specifically address reckless homicide, he repeatedly emphasized to the jury that the petitioner was not guilty of any crime. Like the post-conviction court, we see nothing in the opening and closing statements that the jury would have perceived as abandoning one defense theory for another.

Nevertheless, the post-conviction court, relying heavily on Bruce Poston's assessment of the trial, concluded that the defense rendered deficient performance because it failed to argue the petitioner was guilty of criminally negligent or reckless homicide. However, as stated by our supreme court, "[i]t cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). "[T]he reviewing court should avoid the 'distorting effects of hindsight' and 'judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" State v. Honeycutt, 54 S.W.3d 762, 768 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689-90, 104 S. Ct. at 2065-66). Similarly, this court should not second-guess tactical and strategic decisions by defense counsel. The fact that a strategy or tactic failed or hurt the defense does not alone support a claim of ineffective assistance of counsel. Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997).

The defense's theory at trial was that the physical damage to the petitioner's and the victims' cars did not support the State's claim that the petitioner rammed the victims' car, causing it to wreck. The defense cross-examined the State's witnesses in an effort to develop this defense and argued at length during closing statements that while the petitioner had wanted to stop the victims, he either did not hit their car at all or did not hit it with enough force to cause it to spin out of control. We note that Officer Russell, who inspected the petitioner's car, acknowledged on cross-examination that there was no damage to the car's front bumper. At the post-conviction hearing, co-counsel testified that photographs of both cars supported the defense's theory, and the petitioner testified that lead counsel believed there was a good chance the jury would return a not-guilty verdict. In our view, counsel presented a reasonable defense in light of the State's evidence and developed that defense. Cf. Honeycutt, 54 S.W.3d at 768-69 (concluding that counsel rendered deficient performance by failing to develop an alternate theory of defense when there was a lack of evidence to support the defense's theory and evidence likely could have led jurors to suspect that the defendant's girlfriend committed the crime). Counsel's decision to argue during closing statements that the petitioner was guilty of no crime was a strategic decision that should not be second-guessed by a reviewing court. Moreover, the trial court instructed the jury on all of the lesser included

---

2 We note that counsel cannot be faulted for requesting a vehicular homicide instruction when even this court concluded that vehicular homicide, as lesser grade offense of first degree murder, should have been instructed to the jury. See Hester, No. 03C01-9704-CR-00144, 2000 Tenn. Crim. App. LEXIS 275, at *15.

-11-

offenses of first degree murder, and the jury obviously considered lesser included offenses, finding the petitioner guilty of second degree murder. We note that the petitioner did not have an accident reconstructionist testify at the hearing. Thus, we also conclude that the petitioner has failed to show he was prejudiced by counsel's not arguing he was guilty of a lesser included offense. The post-conviction court erred by concluding the petitioner received the ineffective assistance of counsel.

## B. Waiver of Twelve-Member Jury

Next, the State contends that the post-conviction court erred by concluding the petitioner did not knowingly, intelligently, and voluntarily waive his right to a twelve-member jury. First, the State contends that the petitioner waived this issue by failing to raise it on direct appeal, by not properly raising it in his post-conviction petition, and by expressly agreeing not to raise this issue when he waived his right to a twelve-member jury. The State also contends that, in any event, the record demonstrates the petitioner knowingly, intelligently, and voluntarily waived his right to a twelve-member jury. We conclude that the trial court erred by granting post-conviction relief on this issue.

Under the United States and Tennessee Constitutions, a defendant has a constitutional right to a jury trial. U.S. Const. amend VI; Tenn. Const. art. 1, § 6. In State v. Bobo, 814 S.W.2d 353, 359 (Tenn. 1991), our supreme court recognized that an accused can waive the right to have a jury composed of twelve members. The court stated that

> it is the prerogative of every criminal defendant to waive his right to trial by jury. If the defendant sees fit to waive this right, it is permissible provided the waiver is made in accordance with the safeguards provided by the constitution and implementing statutes or rules of criminal procedure. State v. Durso, 645 S.W.2d 753, 758 (Tenn. 1983). If the defendants could waive the jury entirely, it stands to reason that they could have consented to a trial by the remaining eleven jurors. But, Rule 23 of the Tennessee Rules of Criminal Procedure requires that waivers of trial by jury must be made in writing and with the approval of the court and the consent of the district attorney general. Without formal compliance with Rule 23, the record should clearly show a voluntary relinquishment of the rights to be tried by a common law jury.

Turning to the instant case, the trial transcript reveals that during closing arguments, the trial court had to dismiss a juror who was physically ill. The trial court met with counsel in chambers and announced on the record, without the jury in the courtroom, that pursuant to dicta in Bobo, it believed the petitioner could proceed with an eleven-member jury as long as his waiver of a twelve-member jury was "made in writing and with the approval of the court and the consent of the District Attorney General, and that the record should clearly show a voluntary relinquishment of that right." Co-counsel for the defense announced that the petitioner wanted to proceed with an eleven-member jury. The following exchange then occurred:

THE COURT: Okay. I don't think that he's really giving up a right, waiving a right. But to be on the safe side, I prepared a motion to allow waiver of -- a motion to allow trial by a jury of 11 members. It says, "Comes the above-named defendant, Harvey Phillip Hester, personally and by his attorney . . . and moves the Court to allow said defendant to waive a 12-member jury and to submit this case to a jury of 11 members both as to guilt and punishment, pursuant to the provision of Rule 23, Tennessee Rules of Criminal Procedure." It has a place for the defendant's signature, for attorney for defendant, and approved and concurred in by the Assistant District Attorney General.

Mr. Hester, is that what you want to do?

THE DEFENDANT: Yes, Sir.

THE COURT: And [have your attorneys] satisfactorily explained this to you?

THE DEFENDANT: Yes, sir.

THE COURT: You understand that you have the right at this time to halt the proceedings, the Court will declare a mistrial, this case will be reset for trial for another day; do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And do you also understand that by proceeding, then you are giving up this right to have a mistrial declared, and that you are agreeing to continue; and then if you are convicted of any offense, then, of course, you're giving up the right to raise this as an assignment of error or as an error by the Court in this case; do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And do you have any questions at all about what we're doing here?

THE DEFENDANT: No, sir.

The record reflects that the trial court handed the written waiver form to the petitioner and that the petitioner read and signed the form. The trial court informed the petitioner that any verdict would

still have to be unanimous and asked the petitioner if he had any questions about the waiver. The petitioner said no. The jury returned to the courtroom, the trial court briefly explained why a juror had been dismissed, and closing arguments resumed.

Initially, we note that the petitioner originally raised this issue in his pro se and amended petitions for post-conviction relief as an ineffective assistance of counsel claim, arguing that counsel coerced him into waiving his right to a twelve-member jury and a mistrial by telling him that his family could not afford to retain counsel for a retrial and by failing to inform him that counsel would be appointed for him. The post-conviction court denied relief, concluding that any deficiency in counsels' performance regarding the waiver was not prejudicial. Although the petitioner did not raise the issue of his waiving the right to a twelve-member jury in any other context, the post-conviction court considered whether the petitioner's waiver of the right was also knowing, voluntary, and intelligent. Although the State adamantly claims that the petitioner has waived the issue, we choose to address on the merits the post-conviction court's analysis.

The post-conviction court stated in its written order that "[m]ost of the circumstances surrounding the petitioner's waiver of the right to a twelve-member jury suggest that the waiver was voluntary" but concluded the petitioner's waiver was involuntary because it was based on defense counsel's "unreasonably optimistic assessment" that the evidence would show the victims' speed, not the petitioner's actions, caused the victims' vehicle to crash. As we previously stated, the reviewing court should avoid hindsight and second-guessing trial strategy. In any event, the defense argued during its closing statement as follows:

> The cause of the accident in this case was this [victim] flying down through there. They have not established beyond a reasonable doubt that this contact that [the petitioner] had with [the victims'] car caused it. They have not, because all you've got to do is look at these vehicles, and they are not damaged, they are not. If they were damaged and bent up and beat up and had tremendous impact -- even the girl, even the young lady, when she described it -- I forgot what terminology she used, but she indicated that it wouldn't be much damage to it, which means not much impact.
>
> . . . .
>
> You see, when two vehicles come violently in contact with one another, you generally leave debris, you leave something there, because it's metal on metal. . . . And was there any evidence of impact on this side of the road between those two vehicles? No, no. That is a strong circumstance, ladies and gentlemen, a strong circumstance of innocence of this man, that this man did not cause this accident, that what caused this accident was the speed with which they went down through there.

Given Officer Russell's cross-examination testimony and photographs showing that the front of the petitioner's car lacked significant damage, the defense had a reasonable basis for its argument, and we disagree with the post-conviction court's conclusion that the defense's assessment of the evidence was "unreasonably optimistic." Therefore, the post-conviction court erred by concluding the petitioner's reliance on counsel's unreasonably optimistic assessment of the evidence rendered the waiver of his right to a twelve-member jury involuntary and unintelligent.

Lead counsel testified at the hearing that he discussed the option of a mistrial with the petitioner, and co-counsel testified that he believed he and lead counsel talked with the petitioner about the witnesses and what would be involved in a retrial. The petitioner testified that his attorneys advised him to forego a mistrial because "we had a good chance and they thought it was good." The trial transcript reveals that the trial court verbally informed the petitioner he could waive a twelve-member jury and have an eleven-member jury decide his guilt. The trial court asked the petitioner if that is what he wanted to do and if his attorneys had explained the waiver to him, and the petitioner answered both questions in the affirmative. The trial court also asked the petitioner if he understood he had the right to a mistrial and if he understood he was giving up that right, and the petitioner again said yes. We conclude that the petitioner knowingly, intelligently, and voluntarily waived his right to a twelve-member jury and that he is not entitled to post-conviction relief.

### III. Conclusion

Based upon the foregoing and the parties' briefs, we reverse the judgment of the trial court and conclude that the petitioner is not entitled to post-conviction relief.

_____
NORMA McGEE OGLE, JUDGE